Good morning. My name is Stephen Giskenson. I am the President of the Packer Group. It is my great pleasure to be here today to talk to you about the Plaintiff's Appeal. I would like to begin with a brief introduction along with Seth Rosenberg, representing the Plaintiff, Dr. Michael Koehler, who is in court. Thank you, gentlemen, for coming today. One of the members of our panel, Justice Sheldon Harris, is not here today, but he can avail himself to the recording of the audio on the oral argument. Each side will have 20 minutes for your main argument. The appellate can reserve an additional 10 minutes for rebuttal. You will have to let me know how much time you would like. The signal lights do not work, but I will let you know when you have one minute left. You are probably familiar with this already. The microphones do not amplify. They are there just for recording. Whatever you want to make sure it gets on the record for the audio, make sure you speak loudly. To the extent that you need a break or anything like that, just let us know in advance. To the appellate's counsel, how much time are you planning to reserve for rebuttal? I will reserve five minutes, Judge. Five minutes? Okay. That's it. Do we have any other questions? No, Judge. Great. Well, we can begin. Thank you. May it please the Court. The first issue I want to address is this case should have been dismissed based upon the arbitration clause. The parties to this case agreed upon a very broad arbitration clause in the employment contract at issue in the case. And that employment clause applied to material breaches, disputes, or claims resulting from the agreement. In this case, the plaintiff brought a breach of contract action with his first filing. That was against the Packer Group and Packer Engineering. Under the case law, that was inappropriate. And not only was it inappropriate in terms of not being found in arbitration, but it was also sanctionable under the case law, even the plaintiff cites. The Court allowed the case to proceed and found that the Packer Group and Packer Engineering waived the arbitration clause. We believe this was error. We believe a de novo standard of review applies to this because it was based upon uncontested facts. The only actions the Packer Group took with respect to the proceeding was reactionary. They filed an answer to the complaint. We responded to the plaintiff's discovery request. But we did not put any arbitral issues before the Court. The arbitration clause was raised early on in the case at its infancy. We brought a motion to dismiss before any trial dates were set, before we took any discovery, before we filed any substantive motions. We filed a motion to dismiss. Counselor, you also filed an affirmative defense but failed to mention the arbitration. We did. That was an error. But under the case law, simply filing an affirmative defense is not a basis to waive the arbitration clause. It can be a factor. But here, what we filed was we didn't want to get defaulted. We didn't want to waive any defenses we may have in arbitration. But we simply raised the issue of the plaintiff had breached the agreement. One of the breaches of the agreement, you could argue, was he filed this case in court when he shouldn't have. But we didn't specify that, and it should have been specified. Counsel, why at some point in time during the process didn't you file a motion to compel arbitration? Well, we filed a motion to dismiss because there was no jurisdiction. I understand, but you didn't file a motion to compel, did you? We did not. And on a motion to compel, if it's granted or denied, it's appealable right away, is it not? Because it's injunctive relief? That's true. But there's no reason why you didn't do that. Well, we filed a motion to dismiss because the case shouldn't have been brought here in the first place. But even if we had filed a motion to compel, that would have been denied. It's the same basis of the motion to dismiss. But you could have taken it up right away, could you not? There's no requirement we do that. There's no requirement you submit an interlocutory appeal. I understand that, but I'm saying procedurally. I mean, this case started in 2011. Correct. And here we are, 2016, talking about whether or not you should go back to arbitration. Correct. And that's for the benefit of hindsight. But we never knew the case would last this long and get to this point. Because what happened is, if you remember, at this point in time, this company was under a siege of litigation. It wasn't just this case. We also had the derivative case, two cases filed at Caulfield. And to now open up another proceeding, an appeal, on top of that, when it's not required, is not something we thought was really necessary. No, it's not required, but it would have disposed of the issue of arbitration. Very well. I understand that. But the problem is we were here in the first place because the plaintiff violated the agreement. The plaintiff should never have filed the case in court to begin with. And they get to the point where when that motion was brought, the case expands afterward. Then afterward, they add Dr. Packer. They add Charlotte Sartain. And the first thing that they do is they file a motion based on the arbitration clause. And the trial court still found there was a waiver. It also found, we believe incorrectly, that the claims against them were not arbitrable. And we believe they were because they're intertwined with the agreement. The agreement, in order to prove atrocious interference, you have to prove there's a contract and a breach. That's the same thing they had to prove in the arbitration claim. So, counsel, who were the parties to this contract, this employment contract? The parties to the employment contract were, we believe, Packer Engineering and the plaintiff. Okay. Now, Charlotte Sartain. Individual defendants or not? Not technically parties to the contract. But they certainly are agents of the corporation and beneficiaries of the contract. Well, let me ask you this. Are all corporate officers agents of the corporation? Yes. In every instance? No question? Well, I believe they are. They're agents. Now, whether they're acting in the scope of their agency could be a different issue. But they are agents of a corporation. Is an agency a fact question? Well, their agency relationship exists? Yes, it is. But there's no dispute about this fact because the fact is these individuals, Sartain and Packer, signed the agreement. I'm not saying they're parties to the agreement, but they signed the agreement. And there's case law that talks about the fact that you could be a beneficiary of the agreement if you're a corporate officer. And you could be an agent of the corporation. And you can't avoid the arbitration clause by filing lawsuits in court alleging tort claims against corporate officers, especially here where the very tort claim we're talking about was integral to the contract. They had to prove a breach of the contract. That was an arbitral issue. So let's say that we agree with the trial court relative to the first defendants, the corporate defendants, waiving their right to arbitration. Let's say, just for sake of argument, we agree with that. How does that affect your agency theory for the individual defendants? How could they be an agent of someone who can't assert the right? Well, because they can assert their right. But on their own you're saying they're not as agent. Well, they can't be held to waive something they didn't do. Well, they get their power from the principal. Correct. And they're an agent. The principal doesn't have the power, the trial court said. Right. So, again, if we agree with the trial court, how could we allow the agent to go forward on a power his principal never had? Because the claim against them, even though it's against the agent, still has to prove the arbitral issue of the contract. They have separate rights. The individual has separate rights from the corporation. Against the individuals, you have to prove there was a breach of the contract. It's a separate claim. And, therefore, they would have the right to reject the arbitration clause. And here they didn't get that right. Well, let me ask you this. Should the trial court have had a hearing on the issue of agency? No, because there were no disputed issues of fact. So the other side agreed that the individual defendants were agents of the corporation. Absolutely. And then the contract has them as being agents. The contract says, when they signed the contract, they were acting as agents of the corporation. So that was not disputed in the trial court. Counsel, let's just go back. I want to just finish up this discussion on the court defendants and whether or not they were agents of the corporation. This is all we have time for. I hope we're okay, folks. I'll give you your 30 seconds back. Sure. Let's forget about whether or not this was an error or strategic. I mean, it's a delay. You managed to file a motion to dismiss. We'll never forget this order. I think we're ahead. There's a delay. It causes some prejudice, doesn't it, in terms of whether or not the parties are able to assert their defense to your claim that this should be an arbitration. Well, I don't think there was any more. There was some delay. No question about it. And I don't think there was any prejudice because the bottom line is the only thing we did in substance of the being in discovery was we responded to the plaintiff's document requests. You can leave that in arbitration. And there's no prejudice to the plaintiff here. There was no trial. What if I get you asserting another affirmative defense? There's this notion that you asserted an affirmative defense, and that's what you have. That is your one affirmative defense that you're asserting against the claim. Isn't there sort of an implied conclusion that the plaintiff can make that you're not going to seek arbitration? Well, I don't believe that's true because the bottom line, judges, the defenses can be amended at any time. Look at what the plaintiff did in this case. They amended their complaint three times. So I agree in terms of the procedure there, but the bottom line is there was no prejudice to the plaintiff. There was no substantive issues put before the court in terms of us initiating anything. We didn't initiate any discovery. There was no trial date. There was no depositions. So in the documents we produced are things that could have been used in arbitration. Let's move to the individual defendants then. Sure. Your argument in terms of why the individual defendants, Dr. Packer and Ms. Chartain, did not waive their right to arbitration on the tortious interference claim. Yes. So the very first thing they did shortly after they got through with the complaint, they filed a motion to dismiss, and they raised the arbitration clause. So that was something that we, behind the box, we did. And the trial court held, well, for the same reasons I decided against the corporate defendants, I find that they waived it. Well, they can't have waived something without even being in the case at that point in time. So we don't believe there's any evidence to support a waiver against them whatsoever at all. Again, this is a separate claim against them, and therefore there are no facts to be able to establish waiver against them. The issue in terms of if you don't, the next issue I want to address is liability for tortious interference because this is something that I think is getting sort of misstepped in the case law, but the issue of what happened here is this was not individuals acting on their own. This was the majority of the board of directors, the CEOC, the management committee, acting the way they did. They took action they thought was appropriate. Are you talking, this is that new council that was formed? That was the decision, right? This isn't the board. Are you talking about the council that was later implemented? It's not a new council. The council was in the bylaws. There's two different companies here. There's the Packer Group, which is the parent company, and there's Packer Engineering. The plaintiff was only a CEO of Packer Engineering. The council was of the parent company, and they acted by committee. The committee was called the Chief Executive Officer's Council of the Packer Group, and they're the ones who managed the Packer Group, and they're the ones who made the decision here to move plaintiff to a different position. It wasn't individuals. This was actually a corporate decision that was made, and that's the difference here is they're making it seem like, well, these are individuals acting on their own. This was a corporate decision that was made by not only that committee, but also the majority of the board of directors. That point in time in May of 2010, the majority of the board acted, and that was Danston, Sartain, and Dr. Packer. This doesn't record show, though, pretty unequivocally, that Dr. Packer was the sort of impetus for getting this committee together to make a decision and to bring it up on the table? No question. He was the impetus, but the bottom line was it wasn't his action on his own. He didn't decide, I'm going to do this. He acted through this committee, and the committee also consisted of, again, the majority of the board of directors. This was a corporate action. So you have an anomaly here where you have an individual suing for tortious interference against basically the majority of the board of directors who made this decision, and that's impossible. You can't interfere with your own contract. Counsel, let me ask you about what's needed for proof of tortious interference. Is malice a prerequisite? Do you need to prove malice? Yes, it is. And was there a jury instruction relative to malice? Yes. Well, the court gave an instruction that it felt covered the issue on privilege. It refused our instruction on malice. So do you think that's there? Yes. Actual malice is required. Remember the Philip Mappa case. Actual malice, intent to harm. Once you have a privilege that's inserted in the case, actual malice is required. And here the court refused our instruction on that. But you had in this case a decision that was made with undisputed facts of objective reasons to move this person to a different position. You had declining revenues. No dispute. You had lower employee morale. No dispute. You had the first time ever the company paid layoffs under his watch. No dispute. You had the sexual harassment allegations. You had suspended bonuses. You had suspended 401K matches. There is no dispute on the evidence that this all happened under the plaintiff's watch. And these individuals made a business decision to move him, didn't say we're going to fire him. We're going to move you to a different position. And that was entirely not only appropriate, but that's what they should have done. That's their job. Their job is to exercise their business discretion as directors. This company was in big trouble. And they had to make a decision as to what to do to save the company. That was the decision they made. And what the court allowed was the jury to basically second-guess their business decision. The jury was not qualified to do that. And there was objective evidence in the record that supported the move. So we believe the case never should have gotten to the jury. It should have been a summary judgment or directed verdict. In terms of the damages in the case, the damages here is anomalous, because here we have a plaintiff who recovers $100,000 from breach of contract damages and over a million dollars for tortious interference with the same contract. And this is not a case where the plaintiff alleged or proved any kind of emotional distress, which is recoverable, but that was not an issue in this case. So what you have here is you have the plaintiff saying, I want the benefits of the contract. The contract had a specific severance provision that said if you're terminated, you have a one-year severance. And the court ruled on the contract claim that was all the plaintiff was entitled to. We agree with that. But then on the tortious interference claim, the court said you can recover what you expect to get from the contract, which we believe is not the law and was error. What about the valuation of the stock? The valuation of the stock is in terms of what happened there was the plaintiff was not in the contract and said you get the value of stock. You get stock. That's what he was entitled in the contract. He got stock. And we said why not the value of the stock? The problem here was he never had any evidence of what the value of the stock was when he was terminated. When he was terminated in May of 2010, the valuation that was done was done back in 2008. And that was a snapshot valuation. That was in May of 2008. Here's what the stock is worth. It's worth $20.90. That's what it's worth. And yet the trial court said, well, not only am I going to lie to people in evidence, which we believe is error, I'm not going to let you counsel attack that number with what happened afterward. Because what happened is no one in this company received one penny for their stock from the time plaintiff walked in the door. That stock was worthless because of what happened after he arrived. But that was in the agreement. I mean, that's what the grant was, stock, not value. Correct. He's not entitled to the value of stock. He's entitled to stock. And he's a stockholder. And he's also assuming in a separate case, the derivative case, where we say I'm still a stockholder. That's up on appeal here. But the bottom line is he was not entitled to the value of stock. This number that came out of thin air in terms of that time period was almost two years old. This company was a much different company in May of 2010 than it was when that stock was valued two years earlier. This company had come up through the White House, and we had declining revenues. We had, I can mention it, but the bottom line is the trial court not only said I'm not going to let you attack that, it refused to allow us to call the very person who valued the stock, Brad Van Horn. We tried to call him, and the trial court barred that. The trial court said I'm not going to let you call him. And he would explain, look, the value I gave that stock was good on that day. If the company had layoffs, the company had debt value wouldn't apply, and the court refused us to be able to get into what happened after the fact. The court allowed the plaintiff to get a severance, a tortious interference claim after the four-year period. So the theory is he would have expected to work there for the four years and then he would have been fired without cause. It makes no sense. Counsel, what about the costs? The $37,000 in costs, what's the standard review on that for us? The costs for the plaintiff? Yeah. I believe the standard review is abuse of discretion. Okay. So in this case. But the other thing I want to get to, if I can get to it, is the salary. The salary he was awarded was through the end of 2012. That was the four-year period. The company was gone as of January of 2012. He would never have recovered or received salary. He wasn't entitled to an acceleration. He wasn't entitled to, he admitted his damages, and he wasn't guaranteed that salary. Yes, the contract had a provision that said we were going to review you every year. This wasn't a guaranteed salary amount. The last issue I want to get to is punitive damages. In this case, we don't believe the evidence was sufficient to send this case to the jury on punitive damages. The issue was the same evidence on the tortious interference claim was used to establish punitive damages. And beyond that, the trial court refused. The law is very clear. The defendants have a right. And what's relevant to punitive damages is the financial situation of the defendants. The net worth of the defendants is relevant of punitive damages. The plaintiff objected. The plaintiff said it's not required. We said we agree it's not required, but it's relevant. The trial court barred us from introducing any evidence of our client's net worth. That's a clear violation of the law in terms of what is relevant, because punitive damages, again, are a windfall. And the defendants are allowed to show what their net worth is to see what the appropriate amount of punitive damages would be. Thank you. Thank you. Good morning, Justices. My name is Stephen Distenson on behalf of the plaintiff and the appellee. May it please the Court, counsel. Your Honors, this case has been wending its way, as Justice Connors noted, through the Court for many years. It's been an incredibly arduous case. If the Court were to look at all of the extensive motion practice discovery disputes to the point where the trial court appointed a discovery moderator to try and help the parties behave and comply with discovery. Now we're after a jury trial that lasted for nearly a month, and the plaintiff, pardon me, the appellant, wants to send us all back to start from square one with arbitration. With respect to the arbitration claim, Your Honors, the standard of review is not de novo review. It's abuse of discretion. We cite the Glazer case that establishes the controlling law in this district. In fact, the cases that the appellant cites reflect the fact that the second, third, and fifth district disagree with the first district, but in the first district the law is that the standard is abuse of discretion. And that standard makes sense because it's the trial court who witnesses the parties appearing before it, all the activities that are going on in this case, and Judge Mitchell saw firsthand how much activity there was and what the parties did. That's why it's an abuse of discretion standard. Counsel, just to start on this question, you said the trial court observed how much had already occurred. You didn't bring in the individual defendants until sometime after the corporate defendants. That's correct. So they weren't part of that initial sort of complex discovery and response proceedings. That's correct. And any delay that may have resulted from that. Is that correct? That's correct, yes. Okay, so when they came into the case, what was their initial response of pleading in terms of how did they respond to the complaint? The initial pleading by those defendants, the individuals, was a 2-6-15 and 2-6-19 motion to dismiss, and the 2-6-19 motion to dismiss asserted the arbitration clause. Okay, so how can we dispute that they raised it as soon as they were brought into the case? Well, Your Honor, we don't dispute that. Instead, our position is set forth in our briefing is that it's irrelevant. Those individual defendants are simply not a party to the employment agreement that Dr. Kohler executed with the Packer Group and with Packer Engineering. Those individual defendants signed that employment agreement as the chairman of the board of TPG, or the Packer Group, and as the executive vice president finance of the Packer Group. There's a line of case law, and this is briefed also in your briefing, both parties, that stands for the proposition that there's under agency, under third-party beneficiary, under the broker relationships, that there's a body of law that encourages arbitration, and we would look to the cases that interpret the Uniform Arbitration Act as opposed to sort of the state common law case on agency and whether or not that right to arbitrate extends to the agent. That's right. Is that fair to say? It is. Okay. However, those cases, that line of cases where courts have recognized a relationship, are cases where we've had employees who are being sued for something they did in the scope, and the appellant acknowledged this in his argument a moment ago, some activity, some action, the claim being based on something they did within the scope of their employment that carries them into the arbitration provision of the employment agreement. We didn't have that here. What we had here, and the jury found this, the evidence was ample, is that we had three individuals, Ken Packer, Charlotte Sartain, and Warren Denniston, who's no longer involved in this appeal, those three individuals that acted outside of the scope of their employment to do one thing, to protect their own interests, that wasn't even, couldn't even be said that it wasn't really helping the Packer Group or Packer Engineering, but the jury properly concluded that it was hurting the Packer Group and hurting Packer Engineering. For example, the best evidence of this is that there were three independent directors on the board of directors of the Packer Group. Those three independent directors, when they learned about these financial irregularities for the first time, Dr. Kohler tried to bring it up at a December 15th board meeting in 2009, and he was prevented from discussing it, and he was kicked out of the room. But when they actually found out about these irregularities, when another officer's attorney, Michael King, sent a letter saying, these are problems, I want an independent investigation, they jumped on it because they were very concerned. They jumped on it and they said, okay, we have these six demands that you have to implement, you being Dr. Packer, Ms. Sartain, and Mr. Denniston, the first of which is, Dr. Packer and Ms. Sartain, you have to leave the board. You have to pay back all the money that was transferred out of the Packer Group and Packer Engineering to New Vermilion, which is the company that Dr. Packer owns, and we need a full investigation that you can have nothing to do with. That is, you can't influence it, you can't supervise it. This was so outside of what Packer and Sartain and Denniston were supposed to be doing as part of their employment, that these independent directors said, if you don't implement these points, that were total of six demands, if you do not implement those six demands, we're going to resign from the board. And in fact, after a week of going back and forth on these, what the independent directors called inflexible demands, Dr. Packer, Ms. Sartain, and Mr. Denniston refused, and they resigned. That demonstrates the enormity of the conduct, the breaches, that Dr. Packer, Ms. Sartain, and Mr. Denniston committed in their duties to this corporation, that it made the only independent directors of the corporation resign. So getting back to your question, Justice Luke, it's outside of the scope of the employment that these three individuals transferred all this money, over a million dollars, from the Packer Group and Packer Engineering to Dr. Packer's personal, privately owned company, for which, by the way, he took tax deductions as to all the losses this company was incurring. That's outside of the employment, and that's what gives rise, in part, that's what underlies the tortious interference claim. But we would look at what the language of the arbitration clause is particular to Dr. Packer's own agreement. If you go to his agreement, it says it's anything arising, resulting from this agreement. So shouldn't the focus be on what the rights and obligations of Dr. Kohler are, vis-a-vis the Packer Group and the other corporate officers are, under his employment agreement? Under the employment agreement, yes. Under Dr. Kohler's employment agreement. Yes, but under the tortious interference analysis, not at all. Because the tortious interference analysis is that these three individuals went outside of his employment agreement, they went outside of their role with Packer Engineering and with the Packer Group, and they took money from the company. And when Dr. Kohler found out they took money from the company, they not only acted to suppress him and prevent him from getting information, but they also acted to conceal the information. We reference in our brief the so-called white paper or the report that Warren Dennison prepared in April of 2010. This is the report that he promised to prepare at the board meeting on December 15, 2009. And in that report, what he does incredibly is he takes what was included in the company's audited, consolidated financial statements as a loan to an officer and shareholder, Packer, and he converts that, assigning over half of that loan to New Vermillion. The effect of which is, Your Honor, that New Vermillion is broke. It has no money. It has no assets to secure the loan. So they covered it up. This is conduct that goes far outside the scope of their employment, and the cover-up and the attempt to suppress and ultimately get rid of Dr. Kohler goes far outside the scope of their employment. And I might, just as one example, Justices, we have the advantage here of looking behind the scenes to some extent, because Bruce Stuffield was the corporate attorney for the Packer Group and Packer Engineering during this period of time. He's the one that received that letter from Michael King saying, there are financial irregularities. We demand a special investigation. Within a day of receiving a phone call from Michael King, Mr. Duffield, Packer, and Denison, and Sartain were huddling in their own meeting, and we have the notes. We have Mr. Duffield's notes of that meeting, because in a separate proceeding, the court allowed the production of those over a claim of attorney-client privilege under the crime-fraud exception to the privilege. And what those notes tell us, Your Honor, is, and it's clear as day Mr. Duffield testified to it at trial, right after receiving this letter, the timing's unmistakable, Packer is saying, we need to get rid of Kohler. It's not because Kohler isn't performing his job. It's not because the company supposedly is losing money as a result of Kohler. It's because this investigation into Packer, Sartain's, and Denison's conduct is spiraling out of control. Now there's a claim, and the very next day, without coincidence, the very next day, Packer's instructing the corporate attorney, we have to find a way to get rid of Kohler. It's not just on that day. It's followed up another day saying, we have to get rid of Kohler. We have to get rid of another individual, Dr. Caulfield, who I know Your Honors are familiar with. You had another case involving Dr. Caulfield. That is evidence that this goes well outside of the scope of employment. That's why these individuals, Packer, Sartain, and Denison, don't have the advantage of agency or third-party beneficiary or piercing the corporate veil or alter ego in taking advantage of the arbitration provision. Counsel, can I ask you a basic procedural question? Certainly. When the motions were dismissed were presented on behalf of the individual defendants, was it 2615 and 2619, right, both of them? Yes. And the court ruled on the 2615 failure to state a cause of action, I believe, and correct me if I'm wrong. That's correct. And did the court get to the 2619? The court simply denied the motion and said, for the reasons I said before, I'm denying the motion. Okay. Now, is there any responsibility on the courts, like in this case presented with the 2619 failure to state a cause of action and an affirmative matter 2619 that there's an arbitration agreement, does the court need to look at the arbitration agreement motion first? Is there any responsibility? Have you ever heard of such a thing? I have not. And Your Honor brought up the question before, should there be a motion to compel arbitration. I don't know that there's a rule that says you must file a motion to compel arbitration, but that certainly would have brought the issue to a head right then and there. But to answer your question, Justice Connors, I haven't seen a case that says that. I haven't seen a case that says that. Before I know my time is slipping by. I just wanted to point out the case law that the appellants rely on with respect to their arbitration claim is very distinguishable. The Kostakis case, in that case the court noted that the key is the types of issues submitted. And as Your Honors pointed out during the appellant's argument, they didn't mention the fact that they filed an affirmative defense. It wasn't just an off-the-cuff affirmative defense. They submitted the breach of contract claim to the court for decision by making an affirmative defense that Dr. Kohler breached his employment agreement. Also, in the Kostakis case, the defendant never answered that case until the time that he filed an affirmative defense for arbitration. So in that case, it's distinguishable from here where the defendant did answer, contested the allegations, and filed an affirmative defense asking the court to rule on whether Dr. Kohler breached the employment agreement. There are other distinguishing factors. The one more I've mentioned, and I want to move on to the damages that Your Honor mentioned. But that case also involved the court saying the parties explicitly in their agreement incorporated the AAA rules. And under Rule, I think it was 42, but I didn't write it down, of the AAA rules, this is in their arbitration agreement, it says, quote, no judicial proceedings by any party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate. Wait, back up. Are you saying their agreement included the American Arbitration Rules? The agreement before Your Honors does not. Does not. Yeah, okay. However, the case that the defense or the appellants rely upon, one of the things the court noted is the parties expressed their attention that if they're in court, that will not constitute a waiver of the right to arbitrate. Jenkins is distinguishable. Kennedy is distinguishable. All of them recognize instances where one of the grounds for waiving arbitration is where you file an answer and where you file affirmative defenses. Your Honors, you asked about the damage issue. If I may, one thing I wanted to address before getting to the damage issue is counsel said that actual malice is a requirement for a tortious interference claim. That's directly contrary to the Illinois Supreme Court's decision in HPI. The court in HPI said that what malice means in that context, in the context of tortious interference, is that the conduct was not justified. That's the malice that HPI refers to. It's a very specific line of cases that began with HPI. It couldn't be clearer, and the jury instruction in this case followed HPI to the letter. With respect to tortious interference damages, the trial court correctly ruled here, and we point out the restatement of tort sections that show that tort damages are broader than contract damages. The trial court ruled that under the tortious interference claim, Dr. Kohler is entitled to recover his expectation, his damages, what he contemplated under the contract. And the reason he's entitled to that is because it's only due to the individual defendant's Contrary to the argument in the reply brief and the argument in the motion to have this court take notice of a so-called admission by Dr. Kohler, Dr. Kohler never argued that these defendants breached the employment agreement. Dr. Kohler argued that these defendants tortiously interfered with the employment agreement, causing TPG and Packer Engineering to breach the employment agreement. So those damages, for their interference with that agreement, is he's entitled to what he would have received had that contract been fully performed. What about the stock versus the valuation of the stock? With respect to the valuation, frankly, it's a very intriguing argument to say that the $28.98, or $28.90, I think it's $28.90, valuation of the stock in April of 2010, a month before Dr. Kohler was terminated, is ridiculous and nobody was ever paid that amount of money. The reason that argument is intriguing, if not absurd and outrageous, is because in April 2010, somebody did get a penny for his stock at $28.90, and that somebody is Dr. Packer. Is that in the evidence? It is. It is. There is an exhibit, and I can point the court to it, if I may have just one moment. There is an exhibit which is Charlotte Sartain's handwritten, or not handwritten, typed reconciliation of the amounts that Dr. Packer paid back. I'll find it in one moment. I don't want you to take more time to look at it. I do have it in my notes. What that reconciliation shows, literally, it's typed on the reconciliation, Charlotte Sartain said she prepared it, this is accurate, is that Dr. Packer surrendered X number of shares of TPG stock at $29.80 approximately to pay off some $596,000 worth of the so-called loan that was made to New Vermilion. This is the reclassified loan. So we have three things that go with valuation, Justice Connors. Number one, Charlotte Sartain accepted Dr. Packer's stock at that valuation in April of 2010, and it erased a loan that Dr. Packer and his company owed to TPG of $500 and some thousand. Number two, and we point this out in our brief, Sartain testified that that's the value, the $28.90 that she uses to purchase back stock from employees who are leaving. They use the value that was approved at the last board meeting, and that's what that $28.98 is. Number three, we have the minutes of the December 15, 2009 board meeting, which is five months, six months before Dr. Packer was, pardon me, before Dr. Kohler was terminated. And in the minutes of that board meeting on December 15, it says the board hereby accepts and approves the valuation of $28.90 for Packer's stock. That's December of 2009. That's the value that the company is using. And the reason Dr. Kohler is entitled to that value is because he was wrongfully terminated as a result of the tortious interference by the individual defendants. They excused the condition that he be there for five years or for four years, and that's what was due to him. That's his damages. That's the value of what he expected to receive under that contract, and he didn't receive. And we cite the law that says in determining that value, you look at a time that's closest, reasonably close to the time of breach, which was in May of 2010. I've got one more question. As far as punitive is concerned, shouldn't you take in the financial status of the defendant when you compute punitive damages? Your Honor, you're not required to do that. There are several. Doesn't the case law suggest it pretty strongly? Well, there's a case that we cite in our brief which actually says, and I think it's the, again, coming through my notes, I don't know how to put that in writing. It's the EJ. Go ahead, ma'am. One moment, Judge. Well, you agree with me there is case law that says you must consider the financial status of the defendant. There is case law that says that's one of the factors that can be considered. Yes. Counsel, I have one last question also. Yes, Judge. If we were to overlook, well, forget about the whole forfeiture issue on whether or not he's entitled to both, you raised the issue of whether he's entitled to the contract damages under the settlements and the full expectation of his salary, what is your argument in terms of why he would be able to receive both? The contract. Right. If you look at the compensation provision of the contract, it's clear and unambiguous. It defines a four-year term of the contract at $170,000 a year. Then after, and this is what the document says, this is what the contract says, it's plaintiff's exhibit number one. It says after that period of, after that four-year period of time, here, I have it here. The term of your employment agreement under this agreement would be for a period of four years, beginning on the date of employment, which is December of 2008. Therefore, it goes through November of 2012. Following this initial term, that can only mean following the four-year term unless otherwise mutually agreed, employment will revert, that's the language in the contract, it will revert to an at-will contract. That means during that four-year term, it's not an at-will contract. It's a four-year term contract. And that relates, Justice Lee, to the severance argument. The severance argument that the appellants make is that if he's terminated for cause, he gets one year of severance. The only time cause matters is when it's during the four years. Because during an at-will contract, after the four years, after it reverts to at-will, cause is irrelevant. You can terminate somebody for any reason whatever. So the only way, without just crossing out language from the agreement, the only way to read that agreement is that the parties agree that he will have a four-year term at $170,000 a year, after which it reverts. In our damage submission to the court and to the jury, our position was that he gets four years before he was wrongfully terminated at the behest of Packer, Sartain, and Dennison, and then let's assume he's going to be terminated right away after that four-year period. That's during the at-will period. And under the severance provision, he gets at least one year of severance. Thank you. Thank you, Judge. I'm sorry if I ran over my time. Go ahead. Thank you. Is there a question? One of the things the person's counsel said was this was an arduous case, long years of litigation. It should have never happened. I didn't hear him explain why he filed this case in court. He could have filed an arbitration claim immediately. He should have done that. He didn't do that. And that's why we're here. That's what we went through. That's the purpose of going through litigation classes, filing an arbitration claim, which he was bound to follow. You know, the overall feeling of arbitration, which I think the words that are used in the case are, is arbitration is favored. Waiver is discouraged in arbitration. That's not just words. That has to be applied here. The fact is these claims should have been arbitrated. There was no clear waiver. Filing an affirmative defense, which counsel references, we never asked the court to rule on that. That was filed to protect the record. We didn't file a motion on it. We filed more substantive motions. So in this case, I believe under the law, we did not waive the arbitration provision, either on behalf of the company or on behalf of the individuals. The issue of the requirement, when counsel talked about all the issues of the outside director resigning and the breach of fiduciary duties, those are a separate lawsuit. Again, this is a case about this individual plaintiff and not about whether there was breaches of fiduciary duty or a violation. That's not what this case was about. The issue here is the plaintiff could not prove tortious interference against the individuals, no matter how they were acting, without proving there was a breach of this agreement. And he was required to have that claim submitted in arbitration. The arbitration agreement is extremely broad. It's not just breaches. It's also claims. Anything resulting from this agreement, the claim resulted from this agreement because he had to prove the breach to prove his claim for tortious interference. The issue of the case law and actual malice is a case decided after HBI. Philip I. Maka from this district, which says when you have a privilege involved, you have to prove actual malice. So he's wrong about the case law there. The expectation issue. I'm fascinated by this argument. It's what he expected. What if he expected, for example, to work at that company for the next 50 years? That wasn't expected. Can he get damages for that? It's in his severance pay provision. His expectation is written. I don't think he's asking for a perpetuity of compensation. He has an outrageous comparison. What he's doing is he's saying what I expected was I would work there the full four years despite the fact the company is gone. And then I'd be fired. Remember, after the first four years, he's an employee at will. He can leave on his own. And he's speculating that after that first four years, look, I expect that I'd be fired for cause, that I get a severance. I mean, his expectations aren't relevant. What's relevant is what does the contract say? And what did he get under the he can't do better in this lawsuit than he would have done had he worked there. Had he didn't work in there, this company was gone in January 2012. He wouldn't have done anything for this stock. Their stockholders, my clients, did nothing for their stock. This stock was not worth it. In fact, he brings up the issue of the payment of the debt. That was the last value the company had was the payment was that value. It doesn't mean that's what the stock is worth. If you were going to try to sell at that point in time, you'd never get that for that stock. And he didn't prove he could. And the problem here was the trial court not only said that was a value, it said he denied us the right to attack that number with what happened after the plaintiff left the company. After the plaintiff left the company, he closed the stock. He wasn't able to get 5% the first year. He wouldn't have done it. So the stock valuation continues on. His salary continues on. You have to have reality here is this company would have given him what he's expected, apparently. And his expectations are not determinative. I guess the last issue I want to bring up is the issue of they want to get rid of Mike Kohler. Again, this is a situation where if they try to get rid of a good CEO, they have the most to lose. They have the most invested in this company. And they didn't get rid of him. They offered him a different job at the same salary with the same basic benefits. And he refused it. And the issue of the timing. He exposed these issues with Vermillion the year before. He kept working there until the next May. And yet they want to say, well, this is somehow, this is the reason why. The problem here is we have a jury second-guessing business decisions that are being made by directors who have started this company and raised this company. They never should have gotten to that point in time because there was objective reasons for them to take the actions they did. Thank you very much. The court wants to thank both sides. We'll take the matter under advisement. Thank you for your very well-prepared briefs and oral arguments. Thank you.